McFaeland, J.,
delivered the opinion of the court.
On the 22d of February, 1860, the complainant, Robertson Topp, and one Isaac 1ST. Davis, entered into a contract, by which the latter sold to the former a plantation,’ with the slaves and personal property thereon, in Mississippi. The following is the material part of the written agreement made at the time:
“This memorandum and contract, made and entered into this 22d of February, 1860, 'by and between Isaac N. Davis, of Mississippi, of the first part, and Robertson Topp, of the second part, witnesseth: The said Davis has this day, and by these presents, sold to Robertson Topp the tract of land upon which he is now planting in Bolivar County, Mississippi, on Bayou Phalia; to-wit, all that part of section 24, T. 22, R. 7 W., east of Bayou Phalia, containing three hundred and sixty acres; also the west half of section 19, T. 22, R. 6, W-, containing 320 acres, both together containing 680 acres; also, the following slaves, which are now on said plantation; to-wit, (naming forty-eight). Also, all the mules, horses, and stock, on the plantation, except a black horse belonging to Wm. D. Davis. Also, all the farming utensils, blacksmith’s tools, carpenter’s tools, and in fact everything on the place, except the horse above mentioned, and except the household furniture in the room occupied by W. D. Davis, for the consideration of *170 seventy thousand dollars ($70,000), of which sum Robertson Topp has this day paid me thirty-five thousand dollars ($35,000), the receipt of which is acknowledged. He has likewise executed five notes, of seven thousand dollars each; the first due the 1st of April, 1862; the other four at annual intervals thereafter: all of this date, and bearing interest from date, at the rate of eight per cent per annum. It is understood by the parties to this agreement, as" there is not time to pass regularly deeds for the above mentioned property, that between this and the 1st of May, 1860, the parties are to meet in Memphis, where said Davis is to make, or cause to be made, to said Topp, a deed in fee for said land; also, a bill of sale for said negroes, warranting soundness, and that they are slaves for life, except as hereinafter stated; also, for the stock, farming utensils, &c.; retaining in said deed a lien on said land and slaves for the deferred payments. The exception to the guaranty as to the slaves, consists in this, that the negro girl Jenny was burned on her leg, which injures her to some extent. If said damage cannot be agreed upon between said Topp and said Davis, they mutually agree to leave it to their mutual friend, Prank White, to say what she is damaged by said burn.”
It is then stated that five of the slaves named are valued at nothing in the contract, and that W. D. Davis is at liberty to retain them if he will. This contract was executed by both parties, and witnessed by P. M. White and J. M. Tomeny.
*171 On the same day,' Topp executed another writing,, as follows:
“I have this day bargained and sold to Isaac N„ Davis the following town lots in the city of Memphis (describing them), I obligate myself to make said Davis a deed in fee for said lots.”
The balance of this contract is not, for the present purpose, material.
No price is specified on the face of this contract, but it appears that Davis agreed to take these lots at the price of $15,000, in part payment of the «$35,000 recited in the first contract as having' been paid in hand on the purchase of the land and slaves from Davis; the other $20,000 having been paid in cash, and in a note on a third party.
These two writings are parts of the same transaction.
It appears that the five notes given by Topp, as mentioned in the article first above set forth, were, on the next day, the 23d of February, 1860, surrendered, and five other notes given in their place, payable at the same time; but instead of stipulating for the payment of interest from date at the rate of eight per cent, the interest at that rate, from ' the date to the maturity of each note, was added to the amount of the principal, and each note given for the aggregate thus formed, all payable at the Branch Bank of Tennessee at Memphis.
The circumstances indicate that these writings were executed at Memphis, where Topp resided;
Topp took possession of the plantation, slaves, and *172 other property, at once. No deeds or bills of sale were executed, in pursuance of the stipulations in said articles, and it does not appear that the parties ever again met. Davis died in the latter part of June of the same year, having made and published his will. Topp paid to White, the executor of Davis’s will, the note falling due on the 1st of April, 1862, •at or about its maturity, and soon afterward paid $4,000 on the next note before it fell due.
On the 17th of March, 1866, Topp filed the original bill in this case, the purpose of which is to rescind the entire contract. At this time suit had» been brought at law upon the notes of Topp, except the last, which was not then due. On the 8th of
September, 1866, an amended bill was filed. In the meantime suit had been brought upon the last note. An injunction was obtained restraining the prosecution •of the actions at law.
The grounds for relief set forth in the bill and amended bill, are, in substance, that the defendant, Davis, and his representatives and devisees, failed to make title to the land and slaves in accordance with his contract. That they cannot now make title, because said Davis never had a valid title to all of the land, nor have his devisees such title. That he did not have titlé to all the slaves; and for this reason, as well as because the slaves have been liberated by law, no title can now be made. And the amended bill seeks relief upon the further ground of fraud upon the part of Davis, in concealing from Topp the true state of his title.
*173 The Chancellor pronounced a decree which did not grant to the complainant the relief sought, and from which he appealed. The cause was heard at the last term, and a decree pronounced refusing all material relief to the complainant. A rehearing was granted, and the cause has been again argued at the present term.
One of the first and most important questions, is as to the proper construction of the writings above set forth. Did they operate, in prcesenti, to pass to Topp the title of Davis to the land, slaves, and other property in Mississippi, and to vest in Davis the title to the Memphis lots? or were they mere agreements to convey? "Were they executed or executory contracts?
I am of opinion that, as to the lands certainly, these are executory contracts — agreements to convey,— and that the title did not pass thereby, but remained as before.
I come to this conclusion, not from any technical objections to the form of the paper, or the words used, — although I think the words used are not appropriate for a conveyance; — for, under the statute of Mississippi, as well as that of Tennessee, the absence of the word “heirs,” and other similar objections, are not material. Beyond doubt, it was competent for the parties to stipulate, upon an agreement to sell land, that the title should then pass, or that it should not then pass, but be withheld until some future day, or until the performance of some further condition; and if, upon a survey of the entire instrument, *174 such intention be found to have been therein fairly expressed, it must prevail.
This is, in substance, the principle announced by this •court in the case of Carnes v. Apperson, 2 Sneed, 562; Lafferty v. Whitesides, 1 Swan, 123; 5 Wendell, 26.
In the first of the foregoing articles the language is: “Said Davis has this day, and by these presents, sold to Robertson Topp/’ &c. Admitting, for the sake of argument, that this, standing alone, would be sufficient to convey the title; yet, further on in the same article, is this language: “It is understood by the parties to this agreement, as there is not time to pass regular deeds for the above mentioned property, that between this and the 1st of May, 1860, the parties are to meet in Memphis, where said Davis is to make, or cause to be made, to said Topp, a deed in fee for said land; also, a bill of sale for said ne-groes, warranting soundness, and that they are slaves for life, &c.; retaining in said deed a lien on said land and slaves for the deferred payments.”
If the parties understood that by this article the title to the land passed, and that the contract was, in this regard, an executed one, there could have been no reason for stipulating for the execution of another deed for the same purpose. That they stipulated with so much particularity in regard to the execution of a, deed, is, to my mind, convincing evidence that they did not intend the title to pass by the contract then executed.
It is true, that no further terms are prescribed to be performed by Topp, as a condition upon which *175 tbe deed was to be made; but the intention is plainly expressed, that the title was not to pass until such deed be executed. The only reason stated for the delay, was the want of time; but in one sense it was important, for it gave to Topp the intermediate time to inquire into Davis’s title, if he desired to do so. If, upon such inquiry, material defects were • found, he might have declined to go farther in the matter. This applies, also, to the agreement of Topp to sell the Memphis lots to Davis. Topp expressly covenanted that he would make a deed thereto, thereby implying that what he did make was not regarded as a deed.
It may be stated, though perhaps not very material, that the defendants, in their answer, virtually concede that these are executory contracts.
The next question arising is, assuming these to be executory contracts, is the complainant entitled to a rescission upon the ground of a want of title upon the part of the defendants, or of their failure to make title in accordance with the agreement of Davis?
Lay out of view for the present the question of fraud, made by the amended bill. It is well settled in this State, that a purchaser of land, in possession under a deed with covenants of warranty alone, in the absence of fraud, and before eviction, is entitled to no relief in equity against the payment of the purchase money, upon the ground of defect of title: in such case,. he must rely upon his covenants. Senter v. Hill, 5 Sneed, 505; Ingram v. Morgan, 4 Hum., 66; Young v. Butler, 1 Head, 640.
*176 But this principle, under our authorities, has no application to a case where no deed has been executed, and the purchaser is in possession under a mere equitable title, as a bond or covenant to convey. “In such case,” in the language of Judge McKinney, delivering the opinion of this court in the case of Buchanan v. Alwell, 8 Hum., 516, “he has a clear and well established right in equity to resist the payment of the purchase money, or to have the contract rescinded, and the purchase money advanced refunded to him, on the ground of defect of title in the vendor. He will not be required to complete the purchase, and accept a conveyance, unless a title can be made according to his contract.” See, also, Canningham v. Sharp, 11 Hum., 116; Mullins v. Aiken, 2 Heis., 535; Collins v. Smith, 1 Head, 255; Reed v. Noe, 9 Yer., 286, and many other cases.
We have been referred to several cases decided by the courts of Mississippi, and among them three cases reported in 5 Howard’s Reports, — Coleman v. Rowe, Green v. Finnucane, and Davidson v. Mers, — which, it is argued, should be of controlling weight in the present case. The first of these cases seems to be somewhat in conflict with the decisions in our State. The last two may be reconciled with our cases. But, be this as it may, I do not think that the question under consideration is to be controlled by the local laws of Mississippi.
It is true that, as the land lies in. that State, questions in regard to the title and modes of conveyance, and all similar questions, are controlled by the *177 laws of that State. But our courts have obtained jurisdiction of the parties, and principles of equity are to be administered involving questions of a different character. The cases referred to are certainly to be regarded as authority of a high character, but not as controlling in the sense insisted upon. We should adhere, therefore, to such principles as our own courts have definitely and clearly settled.
The covenant of Davis, in the article referred to, was “to make, or cause to be made, to said Topp a deed in fee for said land.” This meant, not simply a deed good in form, but one fully operative in effect to pass to the complainant an indefeasible fee simple estate. This direct point arose and was decided in the case of Cunningham v. Sharp, 11 Hum., 116, before referred to; the court holding the precise language above quoted, and that unless the defendant was in a condition to make such title, the complainant was not compelled to accept the deed.
It is probably not necessary to decide whether, in equity, the time within which this deed was to be made is to be regarded as of the essence of the contract, for the reason that the complainant here, by making large payments, and by retaining possession of the property, long after the expiration of this period, must be regarded 'as having indefinitely extended the time within which the deed might be made.
By this article, Davis became bound to make to Topp a deed conveying to him an indefeasible fee simple title to the land described. This covenant de *178 volved upon Davis’s devisees at his death, to the extent of any title tbey may bave derived from their testator.
The question was discussed, which party was chargeable with default on account of their failure to meet in Memphis by the 1st of May, and execute the deeds as agreed upon. For the defendants, ■ it was argued that Davis was in Memphis for several days in April, and that their failure to meet and execute the deeds must have been owing to the absence of Topp.
It is not important to discuss the evidence upon this point, for it is clear that at that time Davis was wholly unpi’epared to make title to Topp, not having the title himself. It is not pretended that Davis then had the title; and if he had offered to make Topp a deed at that time, Topp would not have been •compelled to accept it, for the reason that such deed would not have been operative to convey to Topp an indefeasible title.
From the record, it clearly appears that Davis was a< no time during his life in a condition to make the title; nor were the defendants, as his executor ■and devisees, in a condition to do so at the filing of this bill. This is manifest, and is indeed conceded; but for them if is argued that they after-wards, and before the hearing, perfected their title, and that the complainant is bound to accept the title now offered him, upon the principle that the vendor is able to make a good title at any time before final decree, the purchaser will, in the absence of *179 fraud, be compelled to accept it, as was held in Blackmore v. Shelby, 8 Hum., 440, and Goss v. Singleton, 2 Head, 69; see, also, McClure v. Harris, 7 Heis., 379.
This principle is a sound one, with this qualification. But if the vendor sell when he has no title, either legal or equitable, concealing this fact, the purchaser may have a rescission, although the vendor has in the meantime bought the title, and offers to convey. The after-acquired title which the purchaser will be compelled to take, must be a title acquired under the equitable claim held by the vendor at the time. Pipkin v. James, 1 Hum., 325; Woods v. North, 6 Hum., 309; Shaw v. Wilkins, 8 Hum., 647. If A, having no title, legal or equitable, covenant to •convey to B, concealing the fact that he has no title, B would be entitled to a rescission, although A might in the meantime have purchased the title, and offer to convey it.
It would not do to hold contracts of this charac-. ter' binding upon the party thus imposed upon.
How are these principles applicable to the present case?
The bill charges, in general terms, that Davis did not have a valid title to all the land, and that there are encumbrances; but specifies no defect. The answer, in equally • general terms, denies that there is any defect in the title, and alleges that a perfect title can, and will be, made when the complainant shall have complied with his contract, and that any balance of purchase money due from Davis would have been *180 paid, had Topp complied with his contract and paid the purchase money.
The question has been argued, upon whom does the law east the burden of proof in a case of this character? Must the complainant specify the defects in the title, and establish their existence by proof, if denied ?
Our authorities hold the contrary view'. See Boyer v. Porter, 1 Tenn. (Cooper’s ed.), 258; Mullins v. Aiken, 2 Heis., 535.
This rule, we think, upon principle, is undoubtedly sound. The purchaser, before accepting the deed of his vendor, has the right to inspect the title, and if it is not valid, or is doubtful, he will not be compelled to complete his purchase.
The vendor’s muniments of title are supposed to be in his own possession, and he should exhibit them when called upon. The purchaser cannot be expected to hunt up the links of title from the public records. The vendor, by his contract to convey, — nothing else appearing, — represents himself as having a title or right to convey, and he should show this to be so. He-holds the affirmative of the issue. This rule must apply when a rescission or specific execution is sought. The vendor must show how he can make a title. The answer here should properly have set forth the title of the defendants. But no exception was taken on this ground; and the defendants filed as evidence the title papers upon which they rely to show their ability to make the title; and the question is, therefore, properly presented, the burden being upon them.
*181 The next question is, what character of defect will entitle the purchaser to a rescission ?
First. It is well settled that a failure of title to a part of the 'land, which materially affects its value, or which formed an inducement to the purchase, gives the purchaser the option to set aside the contract in toto, or to retain the part to which the title is good, and have a reduction of the price pro tanto. Galloway v. Bradshaw, 5 Sneed, 72; Buchanan v. Alwell, 8 Hum., 519; Mullins v. Aiken, 2 Heis., 543; Cunnigham v. Sharp, 11 Hum., 116.
Second. It is equally well settled that a purchaser is not bound to accept a doubtful title. Cunningham v. Sharp, 11 Hum., 116.
We come now to examine the title to the land in question, upon the evidence filed by defendants. The land agreed to be conveyed was all of section 24, in a certain township and range east of Bayou Phalia, containing 360 acres; also, the west half of section 19, in a certain township and range, containing 320 acres.
First, as to section 24: Davis, at the time of this contract, jointly with F. M. White, held the deed of Charles Clark for an undivided half of this land. The land was originally granted by patent from the United States to J. P. Overton and Eugene McGee. Clark claims to have held McGee’s half by deed from his only child and heir, Mrs. Mason, wife of Egbert Mason, executed jointly with her husband. Their deed is in the record. The only objection to the validity of the title claimed under Clark’s deed to *182 Davis and White, is the want of proof to show that Mrs. Mason was the only heir of Eugene McGee. This was testified to by Charles Clark alone. Objection was taken, in due form, to his testimony, upon the ground that he was an incompetent witness, being bound by covenants of general warranty in his deed to Davis and White. This cause was heard before our statutes removing the incompetency - of witnesses-upon the ground of interest, and we think the exception to his testimony was valid, and should have-been sustained. Ingram v. Smith, 1 Head, 411; Burke v. Clarke, 2 Swan, 310; 1 Greenl. on Ev., sec. 393, et seq.
It would be a question worthy of consideration, if this were the only objection to the title, whether a court of equity should not give the defendants an-opportunity to. supply this defect in the proof; but, for the present, we pass this.
This objection to the testimony of Clark being out of the way, Davis, at the time of his - sale to Topp,. had title to an undivided half of an undivided half of that part of section 24 agreed to be sold. White also had title to the same extent, under the same deed, the two together having title to an undivided half of said land. As to the other half of section 24, at the date of the sale Davis and White held a bond for title thereto, made by Benj. Roach, executor of Benj. Roach, Sr., deceased. We have seen that John P. Overton was the original owner of this undivided half. He conveyed to Gibson; Gibson to Egbert Harris; and Harris, by deed of the 18th of August, 1838, conveyed *183 to ¥m. Earriday this and a large amount of other land, to secure a debt payable by promissory note to Benj. Roach, Sr., of some $14,000. On the 4th of June, 1847, the trustee conveyed,- by deed, this and all the other lands embraced in the deed, to the heirs of Benj. Roach, Sr., by name, showing that he had sold all the lauds together, in accordance with the trust, and that the heirs became the purchasers, for the price of $671.40, which was paid by crediting the amount on the note, the said Benj. Roach, Sr., having, in the meantime, died.
This was the state of the title at the date of the contract, and at the filing of the bill.
The record shows that, at the date of the contract, Davis and White still owed balances of purchase money to Clark, which remained unpaid at Davis’s death, and were a lien upon the interest conveyed by Clark. It is' to be inferred that they still owed Roach, as the last payment due upon their purchase from him, by the terms of the bond, did not fall due until 1862.
If we waive all objections to these titles, the result is that, at the date of this contract, the legal title to the undivided half of the half section in question was in the five individuals who were the heirs of Benj. Roach, Sr., dfeceased. But, in truth, Benj. Roach, Sr., never had any interest in the land. He held, indeed, a debt secured by the deed of trust upon the land, but this deed was a mere incident to the debt. His heirs purchased as individuals, and the title was vested in them accordingly. T! e price *184 bid by them was payable to the personal representative ; and although the beneficial interest may have been theirs, yet, in legal contemplation, the heirs and the personal representative are wholly distinct.
They took the title as purchasers, and did not acquire it by virtue of any equitable title of their ancestor, for he had none.
It is clear, therefore, that these individuals, thus holding the title, were not bound by the bond of Benj. Roach, as executor, to convey this interest in the land to Davis and White, although this bond may have been binding upon Benj. Roach so far as his individual interest was’ concerned, he being one of the heirs.
The result, then-, as to this half interest, is, that Davis and White only held the bond for title of Benj. Roach as his father’s executor. But his father never had any title. The title, then, was in said Benj. Roach, Jr., and his brothers and sisters, being acquired by purchase; and he had no authority from them to sell, so far as this record shows; nor did he profess to sell in their behalf; but, on the contrary, he agreed to sell the title of Benj. Roach, Sr., deceased.
From the date of the contract until the filing of this bill, no steps appear to have been taken to perfect the title of Davis or his devisees. ' Since then, it is claimed that the title has been perfected in the following manner:
First. Benj. Roach, as executor, has made a conveyance, in accordance with his bond, to the heirs and devisees of Davis.
*185 Second. The Roach heirs (except one), have likewise conveyed to the Davis heirs. This excepted one, Mary Roach, married one Jordan, had but one child, and she and her child are both dead. The evidence in this record does not show which survived, the mother or the child. If the latter, the husband, Jordan, as heir of the child, became the owner. The report of a case between the parties, before the Supreme Court of Mississippi, shows this to be the fact; and the court held Jordan entitled to the lands thus descended: but this is not evidence. The defendants, however, introduced the deed of Jordan, releasing to Benj. Roach, executor, all his share in the wild and unimproved lands belonging to the estate of Benj. Roach, Sr., that had been bargained or sold to others, This deed, introduced by- the defendants, is pursuasive evidence that Jordan was the owner of Mary Roach’s share of the lands; but it does not clearly appear that this deed conveyed his share of the land in question: the description does not embrace it.
It will . be observed, from the facts stated, that White was the joint owner with Davis of whatever right or title there was to this land. The deed of Clark was to them jointly. The bond of Benj. Roach was to them jointly. The deed of Benj. Roach, executor, and the deed of the Roach heirs, before mentioned, both recite that- Davis and White had, in the lifetime of the former, entered into an agreement to divide the land, and that, at the request of White, the particular part of the land in question was conveyed to the heirs of Davis; but as to this agree *186 ment of partition between Davis and White, this record furnishes no evidence whatever. White, however, has, since the pendency of the cause, executed a quit-claim deed to the Davis heirs. This is the title now offered by the defendants. Will the complainant be bound to accept it? We think not, for the following reasons:
First. The title to the share of Mary Roach is wholly defective. This is a small undivided interest; whether a sufficient quantity to entitle the complainant to rescission, without more, I will not say; but,
Secondly, the complainant is not now bound to accept the title of the other Roach heirs, because, at the time of the contract, Davis had no right to contract as to this ■ title. His bond from Benj. Roach, executor, was not binding upon their heirs, and Davis had no obligation from them for title. The complainant is not bound to accept their title, although they have voluntarily chosen to convey it; and this, leaving out of view all question as to whether or not the heirs of Egbert Harris may not, in equity, have relief against the sale made by the trustee, Earriday, before mentioned. That sale was made more than six years after the maturity of the note secured by the deed, and a large quantity of lands, in separate tracts, was sold in bulk for a nominal sum. This, at least, throws some shade of doubt upon the title.
Again, we think, upon the same ground, that the complainant is not bound to accept the title conveyed by the quit-claim deed of White. White, it is true, was a witness to the original contract between the *187 complainant and • Davis, and, in equity, he would be estopped to assert his title against the complainant after the latter had paid his money. But while this is ’ true, the complainant would not be bound to accept a title resting only upon an estoppel in pais. Mullins v. Aiken, 2 Heis., 535.
But to all this it is answered, that we must take it that the complainant was fully informed at the time of the contract as to the true state of the title.
I do not assent to this.
It is charged in the bill, that Davis represented that he had a valid title. White, the owner of one-half of all the property, so far as there was any title, was a witness to the contract. He is the executor of Davis’s will, and he files the principal answer. He says that he does not know what representations were made as to the title; and nowhere in this answer does he disclose the fact that he was the owner of one-half of the land; nor does he aver that the complainant was so informed.
It is settled, upon authority and upon the soundest principle, that, as between the contracting parties, the registration of the vendor’s title papers constitutes no notice to the purchaser as to the state of the title; they are only notice to third parties; but the purchaser may rely upon the representations of his vendor. Napier v. Elam, 6 Yer., 108; Ingram v. Morgan, 4 Hum., 66.
I should take it, upon this record, that nothing was said between the parties, at the time, in regard to the title, except what appears upon the face of the *188 writings, there being no proof of any representations either way.
This being so, does not this contract itself show a distinct, solemn representation upon the part of Davis that he then had either a valid legal title, or an equitable title that gave the right to call for and obtain the legal title by the 1st of May, the time when he proposed to make title? We have seen that the import of his agreement was that he would execute, not merely a formal deed, but a deed conveying a valid title. His agreement to do so necessarily implied that he had, or would have, a title to convey. And I must take it, in the absence of anything to the contrary, that this agreement upon the part of Davis contains a most unequivocal representation that he had a valid legal or equitable title to the land, and, in the latter case, that he had the right to call for the legal title by the time stated. And as I think this was in fact not true, it is difficult to resist the conclusion that this was a fraud entitling the complainant to a rescission, unless, with a knowledge of the fraud, he has waived his right to insist upon it.
I do not, however, rest my conclusion upon this ground alone. Upon this subject, see Mullins v. Jones, 1 Head, 517, and authorities there cited; Trigg v. Read, 5 Hum., 529.
Much has been said in argument as to the complainant’s having, by his delay and acquiescence, waived his right to relief. If, with a knowledge of the fraud, he elected to regard the contract as still in *189 force, it is urged that this was a waiver of his right afterward to insist upon the fraud. But this applies only to the fraud. It would not waive his right still to insist upon a valid title. It does not appear that the complainant had knowledge of the state of the title any considerable time before the bill was filed.
I think that the complainant is entitled to have the contract as to the land rescinded, and that the parties should be restored to their former rights.
This results in no hardship to the defendants, inasmuch as their land is restored to them with an account of rents. They lose the benefit of the sale because their testator made a contract which he had not the power to comply with.
I have not noticed the objections made to the title papers filed by' the defendants as evidence, because if this were the only ground of objection to the title, and it in reality appeared that Davis had a. good legal or equitable title which the complainant should be required to accept, I would not be inclined to decree absolutely against the defendants merely because of the defective certificates to their title papers, when this might be remedied by a reference to the master for evidence as to title.
I do not think that the record shows that the-title has become perfect by virtue of the statute of limitations. And this should affirmatively and clearly appear before the purchaser should be required to accept a title requiring such assistance. And then in case of fraud this would be no defense.
*190 I next proceed to consider the case in reference to the slaves and other personal property embraced in the contract. And in the first place, as the language used in the contract in regard to the slaves and personalty is substantially the same as that in regard to the land, the inference is very strong that the contract is likewise executory as to the slaves and personalty; and this is further strengthened by 'the argument that the contract is an entire one. There is this difference, however. A written conveyance is necessary to pass the title to the land, while a valid title to the personalty might pass by a parol sale and delivery, and this applies also to the slaves.
On the other hand, while the title might thus pass, yet the parties might stipulate that the title should not pass except by bills of sale duly executed; and if this intention were clearly expressed, it would have to prevail.
While it does clearly appear that the parties stipulated that bills of sale should be executed, the intention to “retain the title to the slaves and personalty for any definite purpose, does not appear. As to the land, a deed was necessary, and until executed the title would not pass. As to the slaves and personalty, an absolute and unconditional parol sale and delivery would pass the title. The execution of the bills of sale was not dependent upon any condition to be performed by the complainant, but was postponed only for the same reasons that the execution of the deeds was postponed; that is, the ' want of time. The only reason for making the contract ex- *191 ecutory as to the slaves and personalty, may have been that the parties regarding the contract as an entire one, did not think it proper to make it executory in part and executed as to the residue. Had a deed been executed conveying the land, I should not think that a bill of sale was essential to convey the slaves.
Treating the contract for the present as a severable one, and as executory as to the slaves and personalty, I am of opinion that the liberation of the slaves by constitutional amendments, before the conveyance, is no ground for relief to the complainants. In the application of the maxim, Property perishes to the owner, I understand by the owner, not the party who has the naked legal title, but the party who is the beneficial equitable owner. If no other valid objection existed to the execution of this contract, the death of one or more of the slaves before the title was conveyed, would not throw their loss upon the defendants; and if so, then neither would their emancipation.
This is clearly the result, unless this contract be regarded as a covenant upon the part of Davis to make the title, as a condition upon which alone the complainant was bound to comply with the stipulations upon his part; and this view of the matter has been strongly urged upon us.
It would prolong this opinion unreasonably, to review the authorities referred to there. Suffice it to say that we do not think this a case falling within the rule of dependent covenants.
But it is again argued that this is an entire contract, and that if the complainant be entitled to a re *192 scission as.to the land, be will not be compelled .to-abide by the contract as to the slaves; and the force of this argument is hard to resist. The complainant alleges in his bill that the slaves .were the principal inducement to the purchase, but that -the entire property was intended to be taken all together. Had the condition of all the property remained as at the date of the contract, the complainant might well say to the defendants: “As I cannot get a title to the land for the slaves to cultivate, you must also take back the slaves.” But as slaves are no longer property, the force of this reasoning is somewhat weakened.
• The slaves cannot now be returned, and the parties placed in statu quo. It is true that this is not the fault of the complainant, unless, indeed, his delay in coming into court be attributed to his laches.
I cannot say that the defendants are in a condition to cast the blame upon the complainant for failing to discover sooner the defects of title, and the other grounds upon which he is now claiming relief.
It is more than probable, as has been forcibly said in the argument, that but for the results of the war these defects would never have been discovered. This, however, is no objection to the complainant’s right to rely now upon any legitimate ground for throwing the loss resulting from these misfortunes upon the other party.
'-■While the record strongly indicates that this was an entire contract, yet the slaves had a separate value, probably-not in any material degree diminished by the failure:of title to the land, or to a portion of the *193 slaves; and the complainant retained the use of these slaves as long as they remained property. He also retained, and he gives no account of, the other personal property received.
It is now impossible to restore the parties to their former rights; and, with much hesitation,- I yield to the conclusion that the complainant shall account for such of the slaves as the defendants can show that Davis had a valid title to. This is charging the complainant, as to these, with the fault or the misfortune of not having sooner discovered the grounds upon which he now relies for relief.
This record, howeve?, affirmatively shows that Davis • had no title to a portion of these slaves, and no right to sell them. The evidence is found in his will where he says:
“A negro girl na$ned Fanny, which I sold to Mr. Topp last spring, belongs to my children by my first wife. I desire my executors, the first opportunity, to buy another negro, equal in value, to put in her place,, or in any manner they please to arrange that with Mr. Topp. There are also other negroes which I sold to Mr. Topp, which came by my second wife, and belong to her children, and also some that I sold previous to that time to Mr. McGee in the same situation. How, if my two sons, James Webb and Pa-nola Easten, should contend for and recover said ne-groes, under the woman ' law, they shall receive nothing out of the balance of my estate, but the same shall go to the other three first named.”
*194 It is argued that this is the expression of a legal opinion as to the ownership of these slaves.
I do not think so; but understand it as an unequivocal admission that as to Fanny and others of the slaves he had no title, and no right to convey them; and it is to be remarked that the answer is equivocal upon this question, as it does not aver distinctly that Davis had title to any of the slaves, nor is evidence of title offerred, except the fact that Davis was in possession. It is true that the children of Davis, who, according to his will, were the owners of the slaves, are parties to this suit, and that they set up no such title; but it is not now their interest to do so.
Some comment is made upon the fact that the contract does not provide that the bill of sale to be executed by Davis should warrant the title; but this I think immaterial, as the law irhplies a warranty of title where personal property is sold and delivered by a vendor who is then in possession, and this applies to slaves where the bill of sale contains no such warranty. Wood v. Cavin, 1 Head, 506; Trigg v. Faris, 5 Hum., 343.
It is argued that if in fact Davis had no title to these slaves, yet the complainant has suffered no loss, as he kept them and was not disturbed in the possession of them so long as they remained property. The substance of this is, that Davis sold slaves to which he had no title, but by the results of the war they were liberated before his vendee was disturbed in the possession of them, and consequently he shall *195 now be allowed to collect tbe price, which certainly he could not have done had they not been liberated. This proposition cannot be sound.
I think there is nothing in this record from wTiich we can assume that these ■ defects of title, or this want of title, were, made known to the complainant at the time of the purchase. There is no such averment in the answer, although White, the executor, was a witness to the contract.
I think that a prudent man, with a knowledge of these facts, would not have made this purchase.
I am of opinion that the complainant is entitled to a reeission of the contract, including his agreement to convey the Memphis lots.
That he shall be held, however, to account; first, for the value of the personal property received; second, for the value of such of the slaves as Davis really owned, but not for Fanny, or any of those referred to in his will as belonging to his second wife’s children; third, also for such reasonable rents as he was enabled to realize from the lands; and also, upon the same principle, for the hire of such of the slaves as it may turn' out that Davis had no title to, the value of the slaves and the personalty to be estimated upon the basis of $70,000 for the entire property: that is, assuming this to be the value of the entire property, then what was the proportionate value of the property mentioned ?
I am of opinion that the notes including 8 per ■cent interest, were usurious to the extent of the excess •over six per cent, but this becomes immaterial.
*196 The actions at law will be enjoined, at the cost of White as executor.
Upon taking an account, allowing complainant for the payments made, the balance can be ascertained.
The costs of the cause will be equally divided.